Good morning. May it please the Court. John Hangartner on behalf of the plaintiff, Webceleb, Inc. In looking back over the briefs to prepare for the argument today, it strikes me that a lot of issues sort of folded into this appeal, when in fact the appeal itself should and can be treated quite narrowly. The fundamental problem is Judge Sobraw's application of the Rogers test in this case. And in looking back at that decision, it's fairly clear where that analysis went wrong. In applying the Rogers test to the situation here, Judge Sobraw made a finding that defendants' use of Webceleb has some artistic relevance to the underlying award show category in this case. And in making this finding, he made sort of a subsidiary holding that defendants need not refer to plaintiff's product to meet the element of artistic relevance. And I think what we see here is a confusion about the term artistic relevance. In the prior cases that have applied artistic relevance, it's been very consistent, the sort of scenario that's laid out. The defendant is using the mark as an artistic reference in their artistic work. And so it's not just a it's not just a question of is the use of the mark relevant to the underlying work. Is it artistically relevant to the underlying work? And I'll try to explain that in the context here. What we have here is if we assume for a minute that this is an artistic work, it was the term the trademark Webceleb was being used in connection with the People's Choice Awards show and in connection with the Wonderwall website. And so if we assume for a minute that those are artistic works and we don't go down that path, then we look at how was the term Webceleb being used in connection with those works. In this situation, there's no dispute that the term Webceleb is relevant to the underlying works. If you have a Web site that displays pictures of Internet celebrities, the mark Webceleb is relevant to that Web site. And I don't think we've ever taken the position otherwise. The problem is for application of the Rogers test is that it's not being used in a way that's artistically relevant. And to understand the difference, it may help. Let me interrupt if you don't mind. I suspect we've not discussed this case. So I'm speaking only for myself. My instinct is to think the district judge got it wrong under Rogers. But of course, we can affirm on any ground. This one strikes me as fair use. Why isn't this fair use? It's not fair use for a number of reasons. And if we walk through the fair use test, I can I can I can explain why. But be sure to go back to. Yeah, that's what I mean. I'm sorry. Stay with. And we just want to get the fair. Yeah. Just come about some point. Get as long as you're on charges and the others want to hear about it. Fine. OK. That sounds good. I think I forgot. I'd like to reserve two minutes for rebuttal. So. So I'll finish out with Rogers and then move to fair use. That's OK. So. So this distinction of artistic relevance versus just simple relevance is critical to this. If we look, starting at the source, the Rogers case itself, the artistic relevance of the name of that film was a reference to the plaintiff, Ginger Rogers. It wasn't a reference to something that was under inherent in the underlying work. The fact that I respect what you're saying about Rogers one and that's a Second Circuit case. But our our circuit has expanded it to include the body of the work and not just the title anymore. You're not surely you're not suggesting that that's a problem, are you? No, your honor. I'm not. And particularly in terms in view of the Brown case, the supplemental around, you know, that there they made clear that, you know, dog, you know, violent dog shows and so on and violent video games at the test. So you got a little bit of a difficult area there, don't you? No, not at all, your honor. Because, again, it's the nature of the use. It's not where it's being used, whether it's a title, whether it's used inside every one of the Ninth Circuit cases was a reference, an artistic reference to the mark. And I'll use the ESS case, which kind of started this out. And the reason I'm glad you're turning there is that I just I thought we rejected the exact argument you're making now in ESS. No. And if that's the case, then I'm not making my argument. Well, yeah, that's what I wanted to do before you took me away. I'm not getting it. OK. So in ESS, the reference was to the strip club, the playpen strip club in East Los Angeles. And and there was no dispute that the video game itself used the pigpen strip club and that it was, in fact, a reference to the plaintiff's strip club. It was a play on it was a parody of playpen strip club. So and what it was used for was to create an image in this world, in this virtual world of a city somewhat like East Los Angeles, at least in theory. And that was the concept. And it was to create an image by referring to the types of establishments in that kind of area and using a reference to an actual location. And it used a number of references to actual locations in East Los Angeles. And so it was creating this artistic mood, essentially, that included this pigpen strip club. And there was no dispute that that was an intended to be a play on the plaintiff's strip club. There wasn't a year. I mean, I'm sorry. Rockstar did not come in and say we didn't mean the playpen. We just made up that name. They said, no, no, there was no dispute that it was a reference to the playpen. And it was being used to help further this image that was being created. In other words, it was being used artistically. The use of that playpen reference was an artistic reference, just like in the Rogers case, which I understand was second circuit. The title was a play on Ginger Rogers. It was to draw people in and create an association with with the plaintiff, not just with the defendant's product. And this is true across all the cases. I'm just the underlying rationale for the Rogers test. It seems to me this is an even easier case for applying it than the case we were just talking about. Well, the underlying rationale is this First Amendment balance against commercial speech. And the test that was used to strike it was that where it is an artistically relevant use, you have to strike the balance in favor of the First Amendment. It's not they're not using it in some gratuitous fashion. It actually is relevant to what they're trying to do in terms of First Amendment expressive purposes. That's the key thing in my mind that triggers the Rogers test. Not that they're not evoking your client's product. I agree with you on that, but I don't see why that's a necessary condition. And under MCA records, doesn't our case law make clear that it's the relevance of the defendant, not your use, that's really at issue here? Oh, that's right. And that language, I agree, is a bit confusing. The point, if we look at MCA carefully, and this is, again, this is another one of the nine-story occasions, is that the reference is an artistic relevance to the underlying work of the defendant. But if I understood you, and perhaps Judge Watford would have the same problem, I thought you were saying it had to be relevant to your work. And here, in the case of Procter & Gamble, they have the favorite web celeb. It's an award category relevant to the purpose of the People's Choice Awards. It's a live television, like I said, honors entertainers. It's chosen and voted by their fans. Media defendants use web celeb on the Wonderwall. It was relevant to the purpose that that website was to report on celebrity news. As to the defendants, they were using it in an artistically expressive way, but it doesn't have to refer, under our case law, to what your clients use the mark for. No, and I understand exactly that, and I've got to try to clarify the distinction. Okay, because I'm misunderstanding you. And I think what the Court is describing is relevance to the defendant's work, not artistic relevance. Why is it artistically relevant? Because what you're describing is the relevance of the term web celeb to what they're doing. The artistic relevance test talks about almost like using a cultural reference. And I'm going to refer to another case. It doesn't have to be a cultural reference. I understand that. Understood. But the concept is the same. And the problem with cultural reference is where do you draw the line? How big a cultural reference does it need to be? How significant? And that, understandably, has not been adopted by the Ninth Circuit. I'd like to talk about a case that actually was cited in the Brown case because it may be helpful in understanding this. And it's the Dairy Queen case, which was cited by the Brown Court. And it's a case out of the District of Minnesota. And it's decided under eight circuit grounds, so it's really the discussion that I want to talk about with respect to the Rogers test because it makes a very interesting – it may help us understand this. In the Dairy Queen case, New Line Films made a movie about beauty queens in upper Minnesota. And they called it Dairy Queen because it was in dairy land about beauty queens. The testimony was extremely clear that they were not making any reference to Dairy Queen the franchise, Dairy Queen the mark holder. It was just being used to describe the work itself, as we have here. Web Celeb is being used to describe a website with celebrities in it. Here, in the New Line case, Dairy Queen was being used to describe a film about dairy queens, beauty queens in dairy land. And what happened is that the court said that that's the exact opposite of the Rogers test. In Rogers, if the evidence had been that it was a reference to Dairy Queen, that they were evoking Dairy Queen in order to create an artistic reference to their work rather than a purely descriptive type of evidence. It seems to me that the Dairy Queen case that I'm not familiar with, it's a district court case I gather, right? It is, Your Honor. It's saying just exactly the opposite of what you're saying. It seems to back up what the defendants are saying there. They're not trying to invoke your mark. They didn't even know about it, I gather. You say they should have, but they were pursuing on their own basis, just like this case was talking about Dairy Queen. They didn't intend to evoke the mark that Warren Buffett's companies control. They were looking at their own purposes, and so were the defendants according to at least my understanding of what happened here. That's right, but the court rejected the Rogers test in that case. In the district court, so to say, the Rogers doesn't work. The Eighth Circuit and the Ninth Circuit have a very different view of what Rogers means. I mean, we've expanded Rogers well beyond what it was originally covering. Understood. But again, it was in the context of a comparison to the Rogers test, and it's a helpful factual analysis because it explains the distinction I'm trying to make. It's better now that you're milking the argument. Okay. All right, Your Honor. Well, let me bring it back to the Rosa Parks case as well, which has the same issue. In the Rosa Parks case, the name Rosa Parks was used in connection with a song, and again, in that instance, the defendants argued that they were not referring to Rosa Parks to invoke her name and to invoke her status and use her. They weren't actually referring to her at all. No, there it is. It was completely gratuitous. It really had nothing to do with the artistic expression the defendants were trying to engage. Exactly, and here, again, it's not a question. It is. That's my point. But there has to be. All of the cases relate to the plaintiff's mark being used artistically, not just that the term is being used relevant to the defendant's site. It's an artistic use in the sense of, like, you refer to Barbie as a parody. That's making an artistic use of Barbie. It's not just because Barbie appears in the photographs or in the song. It's because you're referring to Barbie to make an artistic point, to use the associations with Barbie, to use those things to make an artistic point, not just to tell people this is a song or a photo about Barbie. And that's really the point. It's an artistic use of plaintiff's mark. Here, defendants were not referring to Web Celeb in order to create some parody of independent music or to use some association with that mark for an artistic purpose. It was purely being used as a trademark, is really what it was being used as by the defendants, as their own trademark. And it brings us to the classic fair use analysis, which is the very first issue as we work through that is was this a trademark use or not. And here, if we look at the examples, it's not simply a descriptive use of the term Web Celeb. They took it and they formatted it and packaged it as a trademark. They had Web pages that were designated as the Web Celeb. But they always referred to their own actual marks, though, in each instance, did they not? I mean, as I understand it, they didn't even know about your mark situation. That's right. And in each instance, they had other trademark information or marks that they referred to every time they referred to this. And I've got it in here somewhere, but it seems to me that's quite different. They distinguished the context in which this was used, did they not? No, Your Honor, they didn't. And often companies use multiple marks to identify a particular thing. For example, on the Wonderwall website, they used the Wonderwall website and they superimposed the Web Celeb mark in front of it. This is a common use of trademarks. Just because the Wonderwall mark still appears on that page, it doesn't mean that Web Celeb was not being used as a mark. But it helped to distinguish the context in which it was used, right? It identified it to a certain extent as being associated with Wonderwall. Is it relevant that, at least as I understand it, according to the record, they didn't even know about your mark? Well, it's relevant only to the extent that it shows that this was not an artistic reference to Plinkton. This was a descriptive or a trademark use of their own product. It was not a reference to the plaintiff. And that's critical to the artistic relevance issue, is that it was not a reference to the plaintiff. Any likelihood of confusion? It doesn't seem to me that there's much evidence of any likelihood. In fact, there's evidence that seems to be the opposite, that your client is basically engaged in trying to get publicity for people who are not celebrities, and Web Celeb or the defendant is they're dealing with people who already are celebrities. I mean, it's such a different proposition in terms of what's going on. I don't know that there's much actual confusion or even possibility of confusion. Well, that's why it was so damaging to Web Celeb, actually, was because their constituents, their brand catered to a group that would reject exactly what was being offered under this Web Celeb mark by the defendant. And so it was particularly damaging. The evidence of confusion is reflected in the increased traffic on the website and in the first year and then in a drop-off in their traffic because they were being so diluted through Twitter and these other things. So there is actual evidence of direct impact on plaintiff's use of the mark. Not necessarily negative either. Actually, very negative in the second year because of their loss of the ability to leverage the social media platform. So they dropped off Twitter, and that was extremely negative to the company, really very damaging. Okay. Let's hear from the other side. We've taken you over, but we will give you a chance to respond. Thank you. Thank you. May it please the Court, I'm Gailen Cummins, and I'll be arguing this morning on behalf of Berman Braun and Microsoft. I'm going to primarily address the First Amendment test and the artistic relevance test and then also why the lack of a trademark use should be a prime official element of an imprisonment claim. Can you keep your voice up, please? Yes, I'm sorry. Can you hear me? And so are you going to divide the time with co-counsel? Yes, I will be. I will be taking the first eight-and-a-half minutes and co-counsel the last six-and-a-half minutes, and he will primarily address the trademark issues, the fair use defense, and any discovery issues that the Court is interested in. So I think it's important that we start with the fact that the evidence is undisputed, that in fact the plaintiff took a generic phrase, web celeb, and registered it for software, and now turns around and sues publishers of a television show and an Internet magazine for using web celeb for its plain underlying meaning to refer to the content of an award, the content of a show, and the content. Can you talk about the background of the case? Maybe you can just go straight to his argument, and why is his analysis of artistic relevance wrong? Okay. The only reason I mention that is in the First Amendment arena, this Court has recognized and the Supreme Court has recognized that we really need bright-line tests, and we really need early dispositive motions. Okay. You've got a limited amount of time. I'd love to hear your response to the argument. So with respect to the artistic relevance test, it was developed in the Second Circuit specifically to protect artistic and expressive works. This Court said in Brown, I think that's the minimum test that can be applied to artistic expressive works, and the reason is the goal is to protect them. We want a wide zone of pre-artistic expression. Two, we need to limit trademarks to their source-identifying function, or they won't play well with the First Amendment. And three, we don't want trademark holders essentially controlling public discourse by coming in and suing every time they see their trademark in content. So the test provides less protection than the First Amendment test, the Hoffman test, which I think applies here as well, but is certainly more certain than the fair use test, which the Court has found not certain enough for artistic works essentially. So the test has remained the same from the Rogers test with respect to what the prongs require. Trademark use is protected unless there is no relevance to the underlying work. I gather that your position is the District Court was correct in applying Rogers, right? I think the District Court was correct in applying Rogers. I think it was incorrect on its ruling on the commercial speech. Okay. And in what way specifically was it incorrect on that latter point? Essentially, I think we're in a better position than Hoffman. I don't think we used a trademark. I don't think we used WCI's trademark. I think we used what their trademark refers to, and that is a phrase they borrowed from society, web celeb, to refer to Internet celebrities. So unlike in Hoffman, I don't think we have a trademark use at all. I think we have pure noncommercial editorial speech. The First Amendment test is the most protective. It's the easiest of the tests to apply. It's the bright line that we need in order to resolve these cases as early as possible so we get rid of the chilling effect on free speech. With respect to the Rogers test, I think it also applies, and that's because we're being sued for using the plaintiff's wordmark. Yes, we didn't know about it. We didn't know they trademarked it in sophomore. But we are being sued for using that mark, and if we use that mark in an artistic work, which is what we did, then in fact the test applies and we meet the Rogers test. I don't understand how our case law has expanded beyond the idea inherent in Rogers, and that is to say the second use is a deliberate play on the first. That is to say in Rogers, it's on Ginger Rogers. It's in Brown. They're using his likeness in the football game. It depends, in a sense, for its artistic use on the ability of the observer to recognize the reference. Now, that's the core of Rogers as it exists. Give me the case law in which we've expanded it to the point where there's no reference to any known prior use at all. That is to say your clients didn't know about Web Celeb. People looking at the TV show, most of them didn't know about Web Celeb. This is not artistic use in the sense of satire, twist on the meaning, nothing. It has nothing to do with them. So give me our case law that tells us the Rogers test expands to that degree. Well, I don't think I can give you your case law. I think the test has remained the same, and I think the facts to which it has been applied, particularly by this court, have evolved over time, but I don't think you've had our fact pattern yet. I think we're probably closest to the Roxbury case. What I'm after is addressing his argument. His argument says, listen, Rogers doesn't apply because they're not referring to anything my client did. The reference that your client is using to Web Celeb has nothing to do with him. They didn't even know about it, nor are the observers of your show expected to know about it. Well, number one, if the Rogers test doesn't apply, then I think the Hoffman test does. But as to the Rogers test, I think we're similar to the Roxbury case. In Roxbury, there's no evidence that the filmmaker knew of the Route 66 trademark holder or owners. What the filmmaker did is to entitle the film, I think it was Penthouse Route 66, and the reason was because the storyline, if you will, involved imagery of a highway, a fleeing couple, and a roadside motel. And that enough, whether they knew of the website owner or not, that enough was an artistic relevance to evoke the imagery of a cross-country Route 66-type trip. And so the court in Roxbury found that, in fact, the Rogers test applied. So the test has evolved. We've gone from – Although the Route 66 case refers to a known road with a known set of associations, I mean, irrespective of whether or not somebody had any trademark associated with Route 66, it had a received and well-understood meaning. Web celeb, as they use it, is actually – it's almost a counterintuitive meaning. Their web celebs are featured because they're not celebrities. Yeah, well, I mean, number one, web celeb has a very common meaning in society, and that's how we used it. We used it for the plain, underlying meaning. So again, if Rogers doesn't apply, then I think we're in the Hoffman test, and I think we went under that ground. But assuming – I mean, it just simply strikes me as illogical that you would afford the Rogers test protection, which was meant to protect artistic expression when a producer of a commercial work unwittingly uses a descriptive phrase that just happens to be the word mark of the plaintiff, when you protect it when you annoyingly take the trademark and you use it for parody, commentary, or satire. It's just – again, the goal of the Rogers test is to protect expressive works. This Court has done nothing but expand that, and I think that's the right answer. And I just think there's no logical reason that you don't expand it to the underlying meaning, the plain use of the descriptive phrase, even if it happens to be the word mark, and you used it because the plaintiff is suing you for using it. Can you go back to your Hoffman argument? Yes. Just run through that. Maybe that's what you were trying to do at the outset where I cut you off and made you go to Rogers. So if you wanted to go back to Hoffman, I'd like to hear what you have to say on that. Well, Hoffman was clear that they actually used a trademark. They used Dustin Hoffman's trademark. And they were sued for it, and this Court applied the noncommercial editorial speech test. And it said simply when you look at speech and it does more than propose a commercial transaction or it's intertwined with commercial and noncommercial speech, it gets the full protection of the First Amendment, and that is because we need to protect free speech, and these are publications like magazines and television shows where the First Amendment rights are at their zenith. And so in order to do that, even if it's commercial intertwined speech with noncommercial, we're going to afford it the highest level of protection. And, again, I think we're actually better than Hoffman because I don't think we used WCI's mark at all. I think we used, again, what it refers to and what they borrowed from society, and that's the common phrase web celeb to refer to Internet celebrities. And, therefore, I think we're in an even better situation than Hoffman. The plaintiff makes much about the fact of, you know, the content sponsorship, partnerships, all of that, but this Court has been absolutely clear it doesn't matter if content makes a profit. The Hoffman test is does it do anything more than basically propose a commercial transaction, and if it does, again, the First Amendment steps in to fully protect it. So if the Court is going to say that Rogers doesn't apply because we didn't use the plaintiff's trademark, then I think the Hoffman test has to apply and we have to be protected under Hoffman. Okay. Did you want to save time for your co-counsel? Yes, I do. Okay. Thank you, Your Honor. May it please the Court. Paul Lowe for Batley Procter & Gamble Company. My client produces the People's Choice Awards show. I want to get right to the heart of what Judge Fletcher said at the beginning, which is this Court obviously can affirm on any grounds, even if it doesn't want to tackle the First Amendment issues in Rogers, there's clearly a case to affirm based on classic fair use. There are three prongs to this. I'll go through it very quickly, but I think the latter two are already satisfied. The second one being descriptive use. Counsel has actually conceded that obviously there's a reference to our work, so there is a dispute there. On the issue of good faith, he's conceded that we never knew about his mark. So the key issue is are we making trademark use of the term Web-Celeb? The key to understanding that, in my view, is to recognize that the appellants are the Johnny-come-latelies to this game. Web-Celeb, and it's undisputed as a term, was in existence ten years before the appellant was even in existence. It was used in our common social lexicon to denote a non-source identifying, very clear primary descriptive meaning, that being the attainment of fame or notoriety on the Internet. And interestingly, that's exactly the way that my clients have used it on the show. It is one of about 35 award categories that denote some recognition for some public acclaim, and here this is about celebrities who do interesting or funny things on the Internet. The primary descriptive meaning, non-source identifying, it is consistent with all the other award titles. You have favorite movie actor, favorite movie actress, you name it. I can only sense two arguments coming from this side about why that is somehow trademark use, and I want to address that. One is somehow the formatting of the presentation. Let's be very clear, and I'll focus on my client's presentation. You have all the screenshots of our website, of the PCA website, and as just Smith noted, every time, every time, you see a mention of the Web-Celeb or favorite Web-Celeb words, it is always associated very clearly with the People's Choice Award insignia or logo. People's Choice has a checkmark through the O. You're going to see that on every page, but beyond that, the Web-Celeb, and Mr. Hangar was suggesting we're trying to create a sub-brand or something, there's nothing that we did with the texting or the formatting of the phrase Web-Celeb that was meant to attract attention. If you look at the record, it's very clear the way we use Web-Celeb, again, as one of 35 categories, was in plain white font. There was nothing fancy, nothing stylized about it. It is a listing amongst many of Web-Celeb or award categories. So the actual presentation, the formatting actually cuts against him. On the second issue, and I think he touched upon it briefly, and I know I have to anticipate a little bit of his reply, he seems to focus on the fact that there's commercialization of this. That's legally irrelevant. Procter & Gamble obviously is a for-profit company. I'm not going to stand up here and say anything otherwise. And we would like the show to be successful. We would like more people to watch the show, and we would like more people to buy our products, if possible. That doesn't make it a trademark use. You have a case in the Ninth Circuit called the Dual Debt Case, where the trademark holder had coined the phrase VCR2, because it was a way you could record programs and watch at the same time. They sued the maker of a stereo system called JVC, because on the back of their receivers there's a plug hole input that says VCR2. Well, guess what? The court rightly sustained a 12B6 motion and possibly even granted Rule 11 sanctions against the plaintiff, because clearly you were using it in a very primary, descriptive sense, just like we're doing. It is no different. Another case that was discussed by both parties regarding the Seventh Circuit, the very instructive, is the Pac-Man case. Chicago Bulls team won six basketball championships. The Tribune decided to publish the front page that says, The Joy of Six. And by the way, the Tribune did more than just publish the paper. Then they created T-shirts and insignia, you know, coffee cups, you name it. They sold all that stuff, because they want to make money. But in that case, the Seventh Circuit affirmed the summary judgment dismissal of the plaintiff's case, because although it says The Joy of Six, which is the plaintiff's mark, it was clearly presented in a way to describe the joy of winning six championships. And guess what? It was always associated with the Chicago Tribune masthead and logo, which is exactly what we did. There can be no question, based on the evidence on the record, and there's no dispute, frankly, about what's out there in terms of facts. He may interpret it differently. It is clear that my client, Procter & Gamble, never, ever used this mark other than as a descriptor of the award category. And I'll reserve a little time if the Court has questions, but I'll get to a little bit about the discovery issue. You're going to let your other counsel speak? Oh, absolutely. I have about 15 seconds left. The discovery issue is that. 15 seconds left. Thank you. Is there yet another counsel who wants to speak? Oh, no. Oh, I'm sorry. No, I'm just saying I want to deal with this really quick issue. Procedurally, they waived the discovery issue. But beyond that, they failed to make any showing about the essentialness of the information they need. The fair use argument we just went through, all that is based on facts already in the record. And with that, I'll close. Thank you. Thank you. Let's put two minutes on the clock. Thank you. I think after I struggled through all that, Judge Fletcher put it very clearly, that there's never been a case in the Ninth Circuit, and I'm not aware of any cases elsewhere, where the artistic relevance test has been applied, where the use of the mark was not a deliberate play on the plaintiff's mark. And in the two cases where that is the situation that I'm aware of, which are the Dairy Queen case and the Parks case, the court rejected the application of the artistic relevance case. In those situations, the defendant said, we weren't referring to plaintiff's mark, and the court in both situations said, well, if that's the case, then the artistic relevance case does not apply. This would be a huge expansion of the application of the Rogers test to situations where the use is not a deliberate play on the plaintiff's mark. And with that, I'll move on to the commercial relevance issue. I mean, on the Hoffman test and the other issues for the time I have left. Microsoft's counsel referred to Web Celeb as a Johnny-come-lately that took a term that was already in common use. Facebook. I mean, this trademark is filled with the application of commonly used words. When I went to college, which was long before Facebook existed as a website, everybody called the yearbook a Facebook. And that was a common usage across the country, I think. Again, there's not evidence on this, but we can talk about this. It is an issue with respect to discovery that can come in later as well. Trademarks are commonly made of words that are in circulation, but used with some twist. And that's exactly what's happened here. Web Celeb was using this not in its ordinary use, which is to refer to as a descriptor of a web celebrity, which is how it's still used commonly without any objection by Web Celeb. Web Celeb uses the term as a mark to refer to its website, which does something counterintuitive, which is to try to promote up-and-coming non-celebrity artists. With respect to the commercial use of this, Judge Sobral got this correct. And the case, the supplemental authority that was cited by Berman Braun, which was the overturning of the Oprah Winfrey case, Kelly Brown versus Oprah Winfrey, that case is very helpful in looking at this issue. Again, this is a use, a determination that this was, in fact, a use of own your power as a mark. In very similar circumstances, although it's print media and other similar uses, what we have here, like in the Kelly Brown case, is a repetitive use of the term Web Celeb in a variety of different contexts, on different platforms, on different Web pages, and in different formats using both the magnifying glass and the others. So taken as a whole, the evidence that's in the record clearly shows that there is use of this, not just as a descriptor of Web celebrities, but as a trademark. And frankly, any issue with respect to the completeness of that evidence is exactly why we believe the Rule 56D motion should have been granted. This motion came up very early. There were five months left in discovery in this case. No depositions had been taken. And Microsoft, at this point, had produced a total of less than 100 pages of discovery. We don't know all of the uses, and plaintiffs are entitled to understand fully all the uses that were made of this Web Celeb mark and should be given that opportunity. Thank you. I thank all of you for very helpful arguments. Web Celeb v. Procter & Gamble now submitted for decision.
judges: Fletcher, Smith, Watford